**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

| | | |
|---|---|---|
| POTTER COUNTY REPUBLICAN PARTY, DANIEL ROGERS, and ALEXANDER HALE, individually and on behalf of all others similarly affected,<br><br>Plaintiffs,<br><br>v.<br><br>CHRISTY BENGE, in her official capacity as the POTTER COUNTY ELECTIONS ADMINISTRATOR and as proposed representative of a defendant class of similarly situated Texas county election officials,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 2:26-cv-00215-Z |

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

TO THE HONORABLE COURT:

Plaintiffs Potter County Republican Party, Daniel Rogers, individually, Alexander Hale, individually, and on behalf of all others similarly affected file this First Amended Complaint for declaratory and injunctive relief against Christy Benge, in her official capacity as the Potter County Elections Administrator and as the proposed representative of a defendant class of similarly situated Texas county election officials. Plaintiffs allege as follows:

## I. NATURE OF THE ACTION

1. Election security is national security. Electronic voting systems have one job—to accurately count the votes on ballots.

2. Secretary of Homeland Security Markwayne Mullin has directed the Department of Homeland Security ("DHS") to prioritize election security. States must trust but verify the results produced by the voting machines. According to DHS and its Cybersecurity and Infrastructure Security Agency ("CISA"), this should include post-election manual counts of paper ballots to ensure that any errors or manipulation in the total vote count is detected and to confirm the accuracy of the vote count by the election machines. *See* Cybersecurity & Infrastructure Sec. Agency, *2026 Election Infrastructure Security Plan: Securing the Next 250*, at 6 (Sept. 2026), https://www.cisa.gov/resources-tools/resources/2026-election-infrastructure-security-plan; ¶ 46, *infra*.

3. A 2024 ODNI Annual Threat Assessment concluded that, "China remains the most active and persistent cyber threat to U.S. Government, private-sector, and critical infrastructure networks. Beijing's cyber espionage pursuits and its industry's export of surveillance, information, and communications technologies increase the threats of aggressive cyber operations against the United States and the suppression of the free flow of information in cyberspace."[1]

4. "[S]ome U.S. adversaries—at a minimum China, Iran, and Russia…have the technical capability to access some U.S. election-related networks and systems"[2] including electronic machines used by the United States to conduct federal elections. The recent declassification of records, including a 2024 ODNI Annual Threat Assessment and a National Intelligence Council Memorandum from October 2024, supports the need for

---

[1] https://www.dni.gov/files/ODNI/documents/assessments/ATA-2024-Unclassified-Report.pdf.

[2] https://www.dni.gov/files/ODNI/documents/assessments/NICM-Declassified-Foreign-Threats-to-US-Elections-After-Voting-Ends-in-2024.pdf.

strong mitigation strategies, particularly considering the known weaknesses in the election infrastructure supply chain.

5. Voting machines with components manufactured by foreign adversaries introduce significant security risks.[3] These vulnerabilities mean that malicious actors could potentially compromise election infrastructure at any stage of the supply chain, even before the machines are assembled or deployed.[4] If a component is tampered with during manufacturing, it could serve as a point-of-entry for malicious hackers, allowing for the possibility of synchronized attacks across multiple election machines and jurisdictions.[5]

6. When testifying before Members of Congress, representatives from many of the voting system vendors acknowledged that their voting machines have parts made in China and detailed universal reliance on foreign made parts.[6]

7. This action concerns whether Texas may leave to the unguided discretion of each county's general custodian of election records whether a documented discrepancy between the paper records and the machine tabulation in a federal election leads to any further count, investigation, or correction, so that identical ballots receive different protection depending on the county in which they are cast.

---

[3] Letter from Secretary of Homeland Security, Markwayne Mullin to White House Transparency Task Force, August 24, 2026.

[4] *Id.*

[5] *Id.*

[6] *2020 Election Security – Perspectives from Voting System Vendors and Experts: Hearing Before the Comm. on H. Admin.*, 116th Cong. (2020), https://nsarchive.gwu.edu/document/24853-document-75-house-committee-house-administration-2020-election-security-perspectives.

8. Plaintiffs do not seek to prevent voting, postpone Election Day, invalidate lawfully cast ballots, or require wholesale replacement of voting equipment. Plaintiffs do not seek to invalidate any provision of the Texas Election Code. Plaintiffs challenge the absence of uniform, mandatory standards for verifying the machine count before certification, including, but not limited to, standards governing what election officials must do when the post-election hand count audit required by Tex. Elec. Code § 127.201 reveals a discrepancy. Plaintiffs seek an order requiring that, before final certification, all lawful paper ballots cast in the federal races in the November 3, 2026, general election be hand counted and reconciled to the machine-tabulated totals, and that the reported results be confirmed, or corrected to match the hand count where they differ; an order preserving the records of that election; and prospective relief governing the verification and certification of future federal elections.

9. In July 2026, the United States Department of Homeland Security ("DHS") and the Federal Emergency Management Agency announced election-security conditions associated with Fiscal Year 2026 Homeland Security Grant Program funding. These conditions include a transition away from voting systems that use barcodes or QR codes to count votes and proof of a post-election manual audit of at least 5% of paper ballots for all federal elections.

10. Texas law independently requires a post-election hand-count audit of paper records or ballots when an electronic voting system is used. *See* Tex. Elec. Code § 127.201. That audit is intended to evaluate the accuracy of the election machines' electronic tabulation and final vote count, but its statutory sampling requirements do not require 5% of all

ballots statewide or a full manual tabulation of paper records or ballots in federal elections.

11. When a voting system records or tabulates the legally operative vote of a citizen voter from a barcode or QR code that the voter cannot personally read, a post-election comparison against the voter-verifiable human-readable paper record or ballot is an essential safeguard against software, configuration, scanning, or tabulation error and against tampering. That safeguard protects voters only if the discrepancies it reveals are acted upon.

12. Texas law requires a post-election hand count audit of paper ballots after every election conducted on an electronic voting system, "to ensure the accuracy of the tabulation." Tex. Elec. Code § 127.201(a). The members of the early voting ballot board perform that count at the direction of the general custodian of election records. *Id.* § 127.201(b-1). But Texas law provides no mandatory, uniform procedure for what happens when the reconciled records of an election do not match.

13. Since September 1, 2025, when Senate Bill 827 took effect, Texas has called this procedure the Post-Election Hand Count Audit, and the November 3, 2026, general election is the first federal general election conducted under it. When reconciliation records show a discrepancy between the number of votes cast and the number of ballots counted, the general custodian of election records is authorized, but not required, to add polling locations or precincts to the audit. When a discrepancy between the hand count and the voting-system results cannot be resolved, the Secretary of State's guidance directs only that the custodian document the discrepancy and the efforts made to resolve it. Nothing in Texas law requires any further count, investigation, or correction before

the results are certified. *See* Tex. Elec. Code § 127.201. For this election the Secretary of State also conducts a risk-limiting audit of selected statewide races, but that audit does not reach congressional races, and it does not prescribe what a county must do about a discrepancy shown by its own reconciliation records or hand count audit.

14. Texas also requires each county to complete, on election night, a preliminary reconciliation comparing the number of voters shown on its election rosters with the number of ballots its tabulation software counted. Texas prescribes no uniform consequence when those numbers do not match, and the preliminary reconciliations for the November 3, 2026, general election show differences in counties across the State, as alleged below.

15. As a result, identical discrepancies are treated differently in different counties. One general custodian may expand the hand count and resolve a discrepancy before certification; another may record the same discrepancy and proceed to certification. Whether a voter's ballot receives the protection the audit was designed to provide therefore depends on the county in which the voter casts it.

16. Plaintiffs' claims do not depend on proof that any official acted with intent to alter any result. Plaintiffs do not seek to invalidate any lawful ballot, to disenfranchise any qualified voter, or to invalidate any provision of the Texas Election Code. Plaintiffs' claims arise under the Fourteenth Amendment, not the Texas Election Code, and do not depend on the Code's current text; the relief they seek would govern whatever audit, reconciliation, and canvass procedures Texas law provides when the count is conducted.

17. Plaintiffs ask that, before final certification, Defendant Benge and the members of the Defendant Class hand count all lawful paper ballots cast in the federal races in the November 3, 2026, general election and reconcile that count to the machine-tabulated totals under uniform procedures fashioned by the Court; that the reported results be confirmed, or corrected to match the hand count where they differ; that the paper records be preserved; and that uniform standards govern the verification of results in future federal elections. The Due Process and Equal Protection Clauses of the Fourteenth Amendment require no less where the State has created a verification procedure but provides no means of acting on what it finds.

18. A complete count is the remedy that fits the violation. A count triggered only by a reported discrepancy leaves the trigger with the custodian whose unguided discretion is challenged here: a discrepancy that is explained away, adjusted out of the records, or never recorded triggers nothing. A sample audit cannot confirm the count in the precincts it does not sample, yet a clean sample can make an untested result appear verified. A hand count of every lawful paper ballot in the federal races, reconciled to the machine-tabulated totals before final certification, is the one uniform standard that does not depend on any custodian's discretion. As used in this Complaint, "lawful paper ballots" means the paper ballots and paper ballot records cast by qualified voters and issued, authenticated, and accepted as Texas law requires, including any signature or initials of an election officer that Texas law requires on the ballot.

## II. PARTIES

19. Plaintiff Potter County Republican Party ("PCRP") is the county organization of the Republican Party serving Potter County, Texas. PCRP has members who are registered

voters and candidates, volunteers, poll workers, and election participants in Potter County. PCRP brings this suit on behalf of its members and in its own legal right. PCRP's nominees appeared on the November 3, 2026, general election ballot in Potter County, and PCRP will nominate candidates in future federal elections whose votes will be counted, audited, and certified under the practices challenged here. The rules that govern whether discrepancies in the count are investigated and corrected directly affect PCRP's electoral interests and the prospects of its nominees. *See Tex. Democratic Party v. Benkiser*, 459 F.3d 582 (5th Cir. 2006); *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71 (2026). PCRP is entitled to appoint watchers to observe the post-election hand count audit in Potter County. PCRP's members, including Plaintiff Rogers, are injured by the challenged practices as alleged below. The injuries of PCRP and its members are fairly traceable to Defendant and the defendant class, each of whom, as general custodian of election records, decides whether a discrepancy leads to any further count or correction, and those injuries would be redressed by the relief requested here.

20. Plaintiff Daniel Rogers ("Rogers") is the Chairman of PCRP, an office to which he is elected by the voters in the Republican primary conducted by Potter County on the voting system at issue here. *See* Tex. Elec. Code § 171.022. He has held that office since July 2018 and intends to seek re-election in future primaries conducted on the same system. Rogers is also a registered voter in Potter County, Texas. He has voted in prior federal elections, voted in the November 3, 2026, general election, including casting a vote for statewide federal office, and intends to vote in future federal elections in Potter County. His ballot is tabulated through the Hart InterCivic Verity 2.7 voting

system that the Texas Secretary of State lists for Potter County, under which each in-person voter marks choices on a ballot marking device that prints a record bearing a QR code, and the scanner tabulates the QR code rather than the human-readable text. Because Texas leaves to each county's general custodian whether a discrepancy found in the post-election hand count audit leads to any further count or correction, Rogers's ballot receives less protection than an identical ballot cast in a county whose custodian expands the audit or resolves the discrepancy before certification. That unequal treatment of his own ballot is an injury personal to Rogers. It is fairly traceable to Defendant Benge, who decides whether Potter County's audit is expanded, and to the defendant class, and it would be redressed by the relief requested here.

21. As county chairman, Rogers holds specific statutory duties in the conduct of elections in Potter County that are not shared with the general public. He appoints his party's watchers for the general election. *See* Tex. Elec. Code § 33.003(a). He submits the list from which the Commissioners Court appoints presiding and alternate election judges. *Id.* § 32.002. He is one of the five members of the Potter County Election Commission, which appoints the Elections Administrator and, by a four-fifths vote with the approval of the Commissioners Court, may suspend or terminate her employment for good and sufficient cause. *Id.* §§ 31.032, 31.037(a). And he is a member of the Potter County Election Board. *Id.* § 51.002.

22. Texas law entitles the watchers Rogers appoints to observe any activity conducted at the location where they serve, to sit or stand near enough to see and hear it, and to observe the processing and tabulation of ballots at the central counting station, and it

makes obstructing a watcher a criminal offense. *Id.* §§ 33.055, 33.056(a), 33.061(a). The Legislature strengthened these protections in 2021.

23. Rogers's watchers cannot perform that function under the system Defendant Benge administers. At the polling place, a watcher can see a voter carry a printed record to the scanner but cannot see what the scanner reads, because it reads a QR code that no person can read. At the central counting station, a watcher can see the tabulator produce totals but cannot observe the count itself, because the count is the machine's reading of codes that no watcher can read. The statutory observation right that Rogers exercises through his watchers therefore cannot be exercised.

24. In 2022, the printed candidate name on thousands of ballot records in Potter County was wrong for several days. In the November 8, 2022, general election, the records printed by Potter County's ballot marking devices in the race for Justice, Supreme Court, Place 9, bore the name "David J. Schenck," a candidate who had lost the March 2022 Republican primary to Evan Young and was not on the general election ballot. Precinct Chair Martha Sell reported the error on October 27, 2022, at the Cornerstone Church polling place, and Susan Rogers confirmed it the same day at the Northwest Library polling place. Several thousand ballots had been cast before the error was detected. No watcher could have detected the error from what the system allowed watchers to observe; it was discovered by a voter who read her own printed record. That evening, in the office of then-Elections Administrator Melynn Huntley, with Defendant Benge, Democratic county chairman David Martinez, and Rogers present, Huntley demonstrated that the error was in the ballot definition and corrected it. When Rogers raised the error with Huntley afterward, she told him that the printed name did

not matter because it is not what is counted. On November 13, 2023, Rogers described these events on the record before the Potter County Commissioners Court; the response was, "I do not recall that conversation."

25. Rogers's injury in his capacity as county chairman is particularized: only two people in Potter County hold that office, and Rogers is one of them. It is concrete: it occurred in 2022 and recurs in every election because the system and procedures have not changed. It is fairly traceable to Defendant Benge, who controls (a) the configuration under which every in-person voter uses a ballot marking device that prints a code, although the same scanner can read hand-marked paper ballots; (b) the scope of the § 127.201 hand count audit, which she conducts and may extend beyond the statutory minimum; (c) whether the human-readable text is reconciled to the tabulated totals and what watchers may observe at central counting; and (d) the ballot definition, where the 2022 error occurred. The Potter County Commissioners Court adopted the voting system; Defendant Benge configures it, defines the ballots, conducts the audit and may expand it, and sets the procedures for observation. And it would be redressed by relief Defendant Benge can grant on her own, including a hand count of the lawful paper ballots in the federal races, reconciled to the machine-tabulated totals before final certification, conducted by counting teams drawn from both parties and observed by watchers from both parties.

26. Plaintiff Alexander Hale ("Hale") was the Republican nominee for United States Congress, Congressional District 7, in the November 3, 2026, general election. Plaintiff Alexander Hale has a concrete and particularized interest in the rules that govern the counting of votes in the election. *Bost v. Ill. State Bd. of Elections,* 607 U.S. 71 (2026).

The votes in Hale's race were counted, audited, and certified by members of the Defendant Class, including the general custodian of election records in Harris County.

27. Defendant Christy Benge is the Potter County Elections Administrator and proposed representative of a defendant class of similarly situated Texas county election officials. The Potter County Elections Administrator supervises elections in Potter County and performs election-related duties assigned by Texas law and by local transfer of duties. To the extent duties otherwise assigned to the county clerk have been transferred to the Elections Administrator under Tex. Elec. Code § 31.043 or other applicable authority, Defendant Benge performs those transferred duties. As general custodian of election records for Potter County, Defendant Benge conducts the post-election hand count audit required by Tex. Elec. Code § 127.201 and decides whether a discrepancy found in that audit leads to any additional count, investigation, or correction before results are certified. Defendant Benge is sued here in only her official capacity and in her capacity as a class representative for the defendant class. No damages are being sought against Defendant Benge. Defendant Benge acts under color of state law.

28. Plaintiffs seek certification of a defendant class under Federal Rule of Civil Procedure 23 consisting of the general custodians of election records in each Texas county who conduct the post-election hand count audit, with Defendant Benge named as the class representative.

## III. JURISDICTION AND VENUE

29. This action arises under the Constitution and laws of the United States. Plaintiffs invoke 42 U.S.C. § 1983 and the Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution. This Court has federal-question jurisdiction

under 28 U.S.C. § 1331 and jurisdiction over civil-rights claims under 28 U.S.C. § 1343(a)(3) and (4).

30. The Court may grant declaratory relief under 28 U.S.C. §§ 2201 and 2202 and prospective injunctive relief against state and local officials acting under color of state law.

31. Venue is proper in the Amarillo Division of the Northern District of Texas under 28 U.S.C. § 1391(b) because Defendant Benge performs official duties in Potter County, Plaintiffs reside or operate in Potter County, and a substantial part of the events or omissions giving rise to the claims occurred and will occur in Potter County, Texas.

## IV. FACTUAL BACKGROUND

32. Texas uses a decentralized election-administration structure in which local authorities conduct the local canvass, and county officials prepare county election returns for statewide federal elections. *See* Tex. Elec. Code §§ 67.002, 67.007. For statewide federal elections, county returns are then canvassed at the state level. *See, e.g.*, Tex. Elec. Code § 67.010.

33. For elections using electronic voting systems, Texas requires the general custodian of election records to conduct a post-election hand-count audit. *See* Tex. Elec. Code § 127.201. The audit includes randomly selected election-day and early-voting locations and selected mail-ballot precincts, with statutory minimums based on 1% or 3 locations/precincts, whichever is greater. Once that audit is complete, Texas law does not require any further count, investigation, or correction when the audit reveals a discrepancy. Whether anything more is done is left to the discretion of each county's general custodian.

34. The Texas Secretary of State describes the hand-count audit as a procedure "to ensure the accuracy of the tabulation of the electronic voting system results." The audit applies to ballots electronically tabulated by optical or digital scanners and includes election-day,

early voting, and applicable mail ballots. That purpose is not served when a discrepancy the audit reveals is left unresolved, or when identical discrepancies are resolved in some counties and merely documented in others.

35. Potter County publishes its post-election hand-count audit materials among its official election records. Potter County's post-election hand count audit for the November 3, 2026, general election is scheduled for November 16, 2026.

36. On election night, the presiding judge of each county's central counting station completes a Preliminary Election Reconciliation on a form prescribed by the Secretary of State, comparing the number of voters shown on the election rosters with the number of ballots counted by the tabulation software. *See* Tex. Elec. Code § 127.131(f). Texas law prescribes no uniform consequence when those numbers do not match.

37. The preliminary reconciliations posted for the November 3, 2026, general election show differences between voters and counted ballots (line J of each form: total voters, less rejected or pending ballots, less ballots counted) in counties across Texas, including Harris County, –4,085 (–0.294%); Dallas County, –544 (–0.07%); Randall County, –71 (–0.1325%); and Lubbock County, +245 (0.23%), with approximately 350 absentee ballots noted as not yet processed. A negative difference means the tabulation software counted more ballots than the rosters show voters, net of rejected and pending ballots; a positive difference means the reverse.

38. Each county decides for itself whether, when, and how to investigate and resolve these differences before the local canvass. Harris County's form attributes its difference in part to electronic pollbooks that may not have synchronized; the Dallas, Randall, and Lubbock forms give no explanation for the difference.

39. The records needed to identify and resolve these differences, including the paper ballots and records, ballot images, cast vote records, reconciliation forms, audit records, and chain-of-custody records from the November 3, 2026, general election, are in the custody of Defendant Benge and the members of the Defendant Class. Plaintiffs ask the Court to order that those records be preserved pending final judgment.

40. On March 20, 2026, the United States government issued a document entitled "National Security Determination on the Threat Posed by Routers Produced by Foreign Countries" (the "Security Determination"). The Security Determination reported that "[t]he President's 2025 National Security Strategy (NSS) says, 'the United States must never be dependent on any outside powerful core components --from raw materials to parts to finished products -- necessary to the nation's defense or economy.'" The Security Determination reported that "[o]ne of these core components that is necessary to both our nation's defense and economy is routers. Routers are the key networking device that enable American ... critical infrastructure providers, and emergency services to connect to the Internet every day." "Routers are critical networking devices that manage the flow of data and information between connected devices."

41. The Security Determination reported that "[c]ompromised routers can enable in-depth network surveillance, data exfiltration, botnet attacks, and unauthorized access to U.S. government or American businesses' networks" and "[a]llowing routers produced abroad to dominate the U.S. market creates unacceptable economic, national security, and cybersecurity risks." The Security Determination reported that "routers produced abroad were directly implicated in the Volt, Flax, and Salt Typhoon cyberattacks which targeted critical American communications, energy, transportation, and water infrastructure." The

Security Determination reported that "[a]ccording to a 2024 National Institute of Standards and Technology Publication, 'A compromised router opens the door to a host of potential exploited vulnerabilities and impacts, ranging from unauthorized access and sensitive information dissemination to the possibility of malicious attacks on connected devices.'" The Security Determination reported that "[u]nsecure and foreign-produced routers are prime targets for attackers and have been used in multiple recent cyber-attacks to enable hackers to gain access to networks and use them as launching pads to compromise critical infrastructure." The Security Determination reported that "routers produced in a foreign country, regardless of the nationality of the producer, pose an *unacceptable risk* to the national security of the United States and to the safety and security of U.S. persons" (Emphasis added).

42. The President of the United States has determined that election systems are part of the national critical infrastructure, and, upon information and belief, foreign routers are used in the Texas election system.

43. On August 24, 2026, United States Department of Homeland Security by and through Markwayne Mullin, Secretary of Homeland Security, sent a letter to the White House Transparency Task Force highlighting the problems with the current election system in the United States and significant issues concerning election machines used to conduct and tabulate United States elections. Secretary Mullin noted that "[r]ecently declassified records, including a 2024 ODNI Annual Threat Assessment, concluded that 'China remains the most active and persistent cyber threat to U.S. Government, private-sector, and critical infrastructure networks.'" Secretary Mullin also noted that "[a] National Intelligence Council Memorandum from October 2024 stated, 'We assess that some U.S. adversaries—

at a minimum China, Iran, and Russia…*have the technical capability to access some U.S. election-related networks and systems*.'" (emphasis added).

44. Secretary Mullin also noted on August 24, 2026, "the need for strong mitigation strategies, particularly considering the *known weaknesses in the election infrastructure supply chain."* (emphasis added). "Voting machines with components manufactured by foreign adversaries introduce *significant security risks*. These vulnerabilities mean that malicious actors could potentially compromise election infrastructure at any stage of the supply chain, even before the machines are assembled or deployed. If a component is tampered with during manufacturing, it could serve as a point-of-entry for hackers, allowing for the possibility of synchronized attacks across multiple [election] machines and [election] jurisdictions." (emphasis added). Secretary Mullin also noted that "the voting-system industry . . . is impacted by the fact that some necessary components cannot be sourced from domestic manufacturers, so vendors are dependent on foreign suppliers. Nine voting system vendors are used in U.S. elections. Three of those vendors, ES&S, Hart InterCivic, and Dominion, make up more than 80% of the market share. Representatives from each of those vendors have acknowledged that their voting machines have parts made in China." Secretary Mullin concluded that "[t]here is no question that election security is national security." ES&S and Hart InterCivic election machines and components are utilized by the majority of the jurisdictions in the State of Texas which are operated by defendant and the defendant class.

45. On September 2, 2026, Secretary Mullin sent a letter to United States Attorney General Todd Blanche raising additional concerns concerning federal elections and the security of federal elections. Secretary Mullin said that the Help America Vote Act ("HAVA")

requires "that any voting system used in a federal election must produce a voter-verifiable paper record with the manual audit capacity. 52 U.S.C. §21081 (a)(2)(B). Because barcodes and QR codes are machine-readable encodings created to eliminate the need for human-readable text, they may not be suitable for voter verification or manual audits." Secretary Mullin also referenced President Trump's Executive Order (EO) 14248 which instructed [federal] agencies to ensure that elections are being held "in compliance with the Federal laws that protect Americans' voting rights and guarding against vote dilution by the illegal voting, discrimination, fraud, and other forms of malfeasance and error." EO 14248 also raised the issue of the security of voting systems that rely on barcodes and QR codes and whether those systems comply with HAVA.

46. In September 2026, CISA published its 2026 Election Infrastructure Security Plan, titled "Securing the Next 250" (the "CISA Plan"). Cybersecurity & Infrastructure Sec. Agency, *2026 Election Infrastructure Security Plan: Securing the Next 250* (Sept. 2026), available at https://www.cisa.gov/resources-tools/resources/2026-election-infrastructure-security-plan. Secretary Mullin tasked CISA with developing the CISA Plan in July 2026. *Id.* at 3. The CISA Plan states that "[t]he American people's confidence that their vote will be counted as cast is essential," *id.*, and that "[s]tate and local election officials have the primary responsibility for protecting election infrastructure," *id.* at 4. It warns that "[e]lection-related software, like all complex software, contains vulnerabilities that require timely remediation," that "structural constraints within the certification ecosystem can significantly limit vendors' ability to release patches and prevent system owners from applying them quickly," and that "[e]lection infrastructure is often accessible from general enterprise networks, which create opportunities for lateral movement by adversaries." *Id.*

at 6. To address those vulnerabilities, the CISA Plan recommends that election officials "[u]se paper ballots that can be easily reviewed to ensure transparency, auditability, and resilience against software failures or manipulation" and "[c]onduct post-election manual audits of paper ballots to verify that voting systems function properly and to identify errors before certifying the final results." *Id.* The CISA Plan also identifies as a threat malicious insiders who make "unauthorized changes to . . . ballot definitions, tabulation configurations, or results-reporting processes," and explains that practices such as "allowing observers to be present during ballot counting" were "specifically designed to reduce the likelihood and impact of insider threats." *Id.* at 7–8. The federal government's own election-security agency thus recognizes that electronic tabulation can fail or be manipulated, that the human-readable paper ballot is the check against that risk, that observation of the count is itself a safeguard, and that the check must be completed, and errors identified, before results are certified. Texas's post-election hand count audit can perform that function only if the discrepancies it reveals are investigated and resolved before certification. Under current Texas practice, whether that happens depends on the county in which a ballot is cast.

47. According to the Secretary of Homeland Security, voting-system vendors whose equipment is used in Texas rely on components manufactured abroad, including in China. The paper record of each ballot provides an independent check on that equipment only if discrepancies between the paper record and the machine count are investigated and resolved under uniform standards.

48. On or about July 10, 2026, DHS/FEMA announced additional election-security conditions for certain FY2026 Homeland Security Grant Program funding. The published conditions

include a transition plan for jurisdictions using electronic systems that count votes from barcodes or QR codes and proof of compliance with a post-election 5% manual audit under federal guidance.

49. Plaintiffs' claims do not depend on proof that any particular voting machine has miscounted votes. Rather, Plaintiffs allege that the federal government's decision to require paper-based transition planning and a larger manual audit reflects a United States government executive branch recognized security need to check independently the machine tabulations against human-readable paper records. A check of that kind protects voters only if the discrepancies it reveals are acted upon under uniform standards.

50. A voter can visually inspect human-readable candidate names or selections printed on a paper record but cannot independently decode a barcode or QR code and determine whether the encoded data corresponds to the voter's intended candidate selections without relying on software that is vulnerable to tampering. HAVA requires that a voting system used in a federal election "permit the voter to verify (in a private and independent manner) the votes selected by the voter on the ballot before the ballot is cast and counted." 52 U.S.C. § 21081(a)(1)(A)(i). A voter who reads the printed text on a record that is tabulated from a QR code has not verified the votes that will be counted. In 2022, the name printed on several thousand Potter County ballot records was not the name of the Republican nominee in that race, and the Elections Administrator explained that the printed name did not matter because it is not what is counted. *See* ¶ 24, *supra*. Defendant and the Defendant Class tabulate encoded data that voters cannot verify in the manner HAVA requires. Plaintiffs plead that requirement as a measure of the burden the challenged practices impose on the right to have votes counted as cast, not as a separate cause of action.

51. Where the electronic tabulator counts encoded data rather than the human-readable text, the paper record or ballot provides an independent verification mechanism only if election officials actually compare the paper records or ballots against the electronic totals reported from the electronic voting machines and resolve the discrepancies that comparison reveals.

52. Absent judicial relief, Defendant Benge and the Defendant Class will continue to decide, county by county and without uniform standards, whether a discrepancy found in the post-election hand count audit leads to any further count or correction, and will not voluntarily adopt uniform standards or conduct the additional manual hand-counting requested here.

## V. PLAINTIFFS' INJURY AND NEED FOR PROSPECTIVE RELIEF

53. The right to vote includes the right to have ballots counted accurately and without dilution of votes by all election officials. *United States v. Classic*, 313 U.S. 299, 315 (1941); *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). Having established a post-election hand count audit to ensure the accuracy of the tabulation, Texas may not administer it so that identical ballots receive different protection depending on the county in which they are cast. *Bush v. Gore*, 531 U.S. 98, 104–05 (2000). An election process that makes an unreadable machine-encoded representation dispositive without uniform standards for acting on discrepancies exposes voters, including Plaintiffs, to irreparable harm resulting from tabulation errors that remain unresolved at certification.

54. The injury is ongoing and will recur in every future federal election conducted under the challenged practices. Plaintiffs seek an order requiring a hand count of all lawful paper ballots in the federal races in the November 3, 2026, general election, reconciled to the machine-tabulated totals before final certification; an order preserving the records of that

election so that the discrepancies in it can be identified and resolved; and prospective relief governing future federal elections.

55. A pre-certification verification of results is less disruptive than post-certification litigation because it uses records already generated in the election, occurs during the ordinary post-election period, and can be designed to preserve statutory deadlines.

56. Plaintiffs have a concrete, particularized, actual or imminent injury under Article III of the U.S. Constitution, rather than merely a generalized interest. Rogers asserts standing first in his capacity as county chairman, whose statutory right to observe the count through his watchers is defeated by the challenged system, *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572 n.7 (1992); *FEC v. Akins*, 524 U.S. 11, 21 (1998), and second as a voter whose own ballot receives less protection than an identical ballot cast in another county, as alleged above. PCRP is injured in its own right through the effect of the challenged practices on its nominees' electoral prospects, and on behalf of its members, including Rogers. Rogers also asserts standing as a member of PCRP.

57. Plaintiff Hale was the Republican nominee for Congress in Congressional District 7 in the November 3, 2026 general election. As a candidate, Hale has a concrete and particularized interest in the rules that govern the counting of votes in his election, which were counted, audited, and certified by members of the Defendant Class. Hale asserts standing as a candidate for the United States Congress in the November 3, 2026 general election.

58. In light of the public interest of this lawsuit, Plaintiffs request that the court not require the posting of a bond or require the posting of only a de minimis bond. Plaintiffs, however, are willing to post a bond, if necessary.

## VI. ALLEGATIONS OF THE DEFENDANT CLASS

59. Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2), and in the alternative 23(b)(1)(A), against a defendant class ("Defendant Class") consisting of all persons who are the general custodian of election records, including those who hold the office of county elections administrator and/or office of county clerk in the State of Texas under Chapter 31, Subchapter B of the Texas Election Code and who, in that capacity, conduct the post-election hand count audit required by Tex. Elec. Code § 127.201 and decide whether a discrepancy found in that audit leads to any further count or correction. Membership in the Defendant Class is determined objectively by whether a person holds the statutory office of county elections administrator and/or county clerk and has the responsibility specified above. No individualized inquiry into a proposed class member's motives, discretionary decisions, or particular factual circumstances is necessary to determine class membership.

60. Texas law establishes the office of county elections administrator and prescribes the duties of persons holding that office. *See* Tex. Elec. Code §§ 31.031–31.050. Among other responsibilities, a county elections administrator performs the duties and functions of the voter registrar, and the duties and functions assigned to the county clerk by the Texas Election Code, as well as election-related duties assigned to the county clerk by other statutes, subject to the provisions of the Election Code. *See id.* § 31.043. The Defendant Class therefore consists of identifiable public officials whose relevant authority and responsibilities arise from a common body of Texas statutory law.

61. The Defendant Class is sufficiently numerous that joinder of all its members is impracticable, encompassing the corresponding offices in all the counties in Texas. Requiring Plaintiffs separately to name, serve, and litigate substantially identical claims

against each such official would result in unnecessary duplication of proceedings, impose substantial burdens upon the parties and the courts, and create a substantial risk of inconsistent adjudications concerning the same federal legal requirements and the administration of the same Texas election laws.

62. There are questions of law and fact common to the Defendant Class. Every member conducts the post-election hand count audit under the same statute, Tex. Elec. Code § 127.201, and exercises the same unguided discretion over whether a discrepancy found in that audit leads to any further count, investigation, or correction. The common questions include whether administering the audit without uniform, mandatory standards for acting on discrepancies violates the Equal Protection Clause; whether it violates the right to have one's vote counted as cast; whether certifying results while documented discrepancies remain unresolved violates the Due Process Clause; whether Defendant Class members must be ordered to hand count the lawful paper ballots in the federal races and reconcile that count to the machine-tabulated totals before final certification; and whether Defendant Class members must be enjoined to apply uniform standards. That members have exercised their discretion differently is the source of the violation alleged, not a reason to deny certification. Resolution of these common questions will generate answers applicable to the Defendant Class as a whole rather than answers dependent upon the identity of any particular county elections administrator.

63. The defenses of the named class representative Defendant Benge are typical of the defenses of all of the Defendant Class members. The named class representative Defendant Benge holds the same statutory office as the absent Defendant Class members, exercises the relevant authority pursuant to the same provisions of Texas law, and is subject to the same

federal constitutional and statutory limitations upon the exercise of that authority. The principal defenses available to the class representative Defendant Benge concerning the legality of the challenged practices described herein therefore are the same defenses available to the Defendant Class members generally.

64. The named class representative Defendant Benge will fairly and adequately protect the interests of the Defendant Class members. The class representative Defendant Benge shares with the absent Defendant Class members the same official interest in defending the legality of the challenged election practice and the authority and obligations of county elections administrators under Texas law. No material conflict exists between the class representative Defendant Benge and absent class members concerning the common legal questions presented for class-wide adjudication. Class representative Defendant Benge is situated to present fully the defenses available to Texas county elections administrators concerning those questions, including the defenses available to officials in counties larger than Potter County, because every member operates under the same statute, performs the same audit duties, and has the same legal defenses.

65. Certification is appropriate under Rule 23(b)(2) because the Defendant Class members have acted, refused to act, or are obligated to act on grounds that apply generally to the Defendant Class members with respect to administering the post-election hand count audit without uniform, mandatory standards for acting on discrepancies. Plaintiffs challenge this failure by Texas county elections administrators pursuant to their statutory offices and duties, rather than seeking adjudication of isolated or idiosyncratic acts by individual county officials. Accordingly, final injunctive relief and corresponding declaratory relief are appropriate respecting the Defendant Class as a whole.

66. In the alternative, certification is appropriate under Rule 23(b)(1)(A) because prosecuting separate actions against each county's general custodian of election records would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for the officials who administer the same statute in the same federal elections.

67. The declaratory and injunctive relief sought is indivisible with respect to the Defendant Class. Plaintiffs seek a declaration establishing that the post-election hand count audit must be administered under uniform, mandatory standards for acting on discrepancies, together with an injunction requiring each Defendant Class member, in his or her official capacity as county elections administrator, to hand count the lawful paper ballots in the federal races under uniform procedures fashioned by the Court before final certification and to comply with that injunction order in administering elections. Such relief can operate uniformly against every member of the Defendant Class without individualized determinations of damages, liability, intent, or remedy. The relief sought is only declaratory and injunctive and would operate generally with respect to the class rather than require individualized damages determinations.

68. Certification of the Defendant Class will promote the efficient and consistent resolution of this controversy. A single adjudication can determine the federal legal requirements governing the challenged conduct of Texas county elections administrators and can provide uniform prospective relief, thereby avoiding duplicative litigation and the possibility that substantially identical conduct by county elections administrators will be subject to conflicting judicial determinations.

69. Plaintiffs therefore request that the Court certify the Defendant Class pursuant to Rules 23(a) and 23(b)(2), or in the alternative 23(b)(1)(A), appoint Defendant Benge as

representative of the Defendant Class, and enter such orders concerning notice and representation as the Court determines necessary or appropriate to protect the interests of absent Defendant Class members.

## VII. CAUSES OF ACTION

### COUNT I
### 42 U.S.C. § 1983 —
### Fourteenth Amendment Equal Protection.

70. Plaintiffs incorporate all paragraphs as if fully set forth herein.

71. Defendant Benge, as representative of the Defendant Class, acts under color of Texas law when administering elections, conducting or supervising post-election procedures, maintaining election records, and performing any transferred duties concerning county election returns.

72. The Equal Protection Clause forbids a State, having granted the right to vote on equal terms, to value one person's vote over that of another by later arbitrary and disparate treatment. *Bush v. Gore*, 531 U.S. 98, 104–05 (2000); *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). Texas requires a post-election hand count audit to ensure the accuracy of the tabulation of electronic voting systems, and a reconciliation of voters to counted ballots, but leaves to each general custodian of election records, without any uniform standard, whether a discrepancy shown by those records leads to any further count, investigation, or correction.

73. As a result, identical discrepancies are expanded and resolved in some counties and merely documented in others, and identical ballots cast in the same federal election receive different protection depending on the county in which they are cast. That standardless, county-by-county treatment is arbitrary and disparate treatment of voters' ballots in

violation of the Equal Protection Clause. It also defeats the Legislature's declared intent "that the application of this code and the conduct of elections be uniform and consistent throughout this state to reduce the likelihood of fraud in the conduct of elections, protect the secrecy of the ballot, promote voter access, and ensure that all legally cast ballots are counted." Tex. Elec. Code § 1.0015; *see id.* § 1.003(a-1) (election officials "shall strictly construe the provisions of this code to effect the intent of the legislature under Section 1.0015").

74. A hand count of all lawful paper ballots in the federal races, reconciled to the machine-tabulated totals under uniform procedures before final certification, is a practicable safeguard: it uses paper ballots and records the election has already generated and the same counting procedures the State uses in its post-election hand count audit.

75. Plaintiffs therefore seek prospective declaratory and injunctive relief under §1983.

**COUNT II**
**42 U.S.C. § 1983 — Fourteenth Amendment Right to Have Votes Counted.**

76. Plaintiffs incorporate all paragraphs as if fully set forth herein.

77. The right to vote includes the right to have one's vote counted as cast. *United States v. Classic*, 313 U.S. 299, 315 (1941). Challenges to state election procedures are evaluated by weighing the character and magnitude of the asserted injury against the precise interests put forward by the State. *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

78. The burden on Plaintiffs is real. A voter whose ballot is tabulated from an encoded barcode or QR code cannot confirm that the encoding matches his selections, and the only independent check, the post-election hand count audit, carries no mandatory consequence when it reveals a discrepancy. The injury is not merely that the voter cannot read the code.

It is that when the code and the human-readable record disagree, and the State's own reconciliation or audit documents the disagreement, nothing requires that the discrepancy be resolved before certification, so the voter's ballot may not be counted as cast, and identical discrepancies are resolved in some counties and not in others.

79. The State has no legitimate interest in permitting documented discrepancies to remain unresolved, or in permitting identical discrepancies to be treated differently from county to county. The relief Plaintiffs seek uses ballots, records, personnel, and procedures already required by Tex. Elec. Code § 127.201.

80. Plaintiffs therefore seek prospective declaratory and injunctive relief under § 1983.

**COUNT III**
**42 U.S.C. § 1983 — Fourteenth Amendment Substantive Due Process.**

81. Plaintiffs incorporate all paragraphs as if fully set forth herein.

82. The Due Process Clause protects voters against election practices that reach the point of patent and fundamental unfairness. *See Griffin v. Burns*, 570 F.2d 1065 (1st Cir. 1978); *Roe v. Alabama*, 43 F.3d 574 (11th Cir. 1995).

83. Certifying the results of a federal election while discrepancies documented by the State's own audit remain unexplained and unresolved, under a regime that requires no further inquiry, is fundamentally unfair to the voters whose ballots are affected.

84. Plaintiffs do not assert a procedural due process claim.

85. Plaintiffs therefore seek prospective declaratory and injunctive relief under § 1983.

**COUNT IV**
**Declaratory Judgment — 28 U.S.C. §§ 2201–2202.**

86. Plaintiffs incorporate all paragraphs as if fully set forth herein.

87. An actual controversy exists concerning whether Defendant and the Defendant Class members may administer the post-election hand count audit for federal elections without uniform, mandatory standards for acting on discrepancies, may certify results while discrepancies documented by that audit remain unresolved, and may certify the results of the federal races without first hand counting the lawful paper ballots and reconciling that count to the machine-tabulated totals.

88. Plaintiffs seek a declaration that the Fourteenth Amendment requires that the post-election hand count audit in federal elections be administered under uniform, mandatory standards for acting on discrepancies, and that the lawful paper ballots in the federal races be hand counted and reconciled to the machine-tabulated totals before the results are finally certified.

## VIII. IRREPARABLE HARM AND PUBLIC INTEREST

89. The deprivation or material burden of United States Constitutional voting rights constitutes irreparable harm to Plaintiffs for which damages would not provide an adequate remedy.

90. Plaintiffs request that any injunction be tailored to require a hand count of all lawful paper ballots in the federal races in the November 3, 2026, general election, reconciled to the machine-tabulated totals under uniform procedures fashioned by the Court before final certification; preservation of the records of that election; and the adoption and application of uniform standards for acting on audit discrepancies in future federal elections.

91. The public interest favors accurate, transparent, timely, and verifiable election results. Plaintiffs recognize the public interest in orderly election administration and request procedures that can be implemented within existing post-election processes.

92. No administrative exhaustion requirement applies to this claim under 42 U.S.C. §1983.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter a preliminary injunction and final judgment in their favor against Defendant Benge and the Defendant Class as follows:

a. Certify the requested Defendant Class under Federal Rule of Civil Procedure 23(a) and 23(b)(2), or in the alternative 23(b)(1)(A);

b. Declare that administering the post-election hand count audit of lawful paper ballots in federal elections without uniform, mandatory standards for acting on discrepancies violates the Fourteenth Amendment;

c. Enjoin Defendant and the Defendant Class to preserve all paper records, ballots, ballot images, cast vote records, reconciliation forms, audit records, and chain-of-custody records from the November 3, 2026, general election pending final judgment;

d. Order Defendant Benge to conduct a hand count of the lawful paper records in Potter County for the federal races on the November 3, 2026, general election ballot, reconciled to the machine-tabulated totals, by counting teams drawn from nominees of both county chairmen and observed by watchers from both parties at every table;

e. Order Defendant and the Defendant Class to conduct, before final certification, a hand count of the lawful paper records for the federal races, reconciled to the machine-tabulated totals, under uniform procedures fashioned by the Court;

f. Enjoin Defendant and the Defendant Class, in future federal elections, to apply uniform standards for acting on discrepancies found in the reconciliation of voters to counted ballots and in the post-election hand count audit;

g. Require a manual hand count of all voter-verifiable, human-readable, lawful paper records or ballots in all precincts in Texas before final certification of the election for statewide federal office;

h. Confirm the election results for all federal elections held on November 3, 2026, in Texas for all federal races in Texas based on the hand count of all lawful paper ballots from all lawful Texas citizens, if different from the election results reported by the election machines;

i. Award Plaintiffs reasonable attorney's fees and costs to the extent authorized by 42 U.S.C. § 1988 and other applicable law; and

j. Grant such other and further relief as the Court deems just and proper.

Dated: November 14, 2026.

Respectfully submitted,

/s/ Jared R. Woodfill
Jared R. Woodfill
State Bar No. 00788715
Adam M. Helleck
State Bar No. 24038953
WOODFILL LAW FIRM, PC
5850 San Felipe, 5th Floor
Houston, Texas 77057
Telephone: (832) 255-3751
Woodfillservice@gmail.com

/s/ Daniel Bates
Daniel Bates
State Bar No. 01899900
DECKER JONES, PC
801 Cherry Street, Suite 2000, Unit 46
Fort Worth, Texas 76102
Telephone: (817) 336-2400
dbates@deckerjones.com

ATTORNEYS FOR PLAINTIFFS POTTER COUNTY REPUBLICAN PARTY, DANIEL ROGERS, AND ALEXANDER HALE

## CERTIFICATE OF SERVICE

I certify that on November 14, 2026, I electronically filed the foregoing document with the Clerk of Court for the United States District Court for the Northern District of Texas using the Court's CM/ECF system, which will send notice of the filing to all counsel of record.

/s/ Jared R. Woodfill
Jared R. Woodfill